Filed 12/7/15  P. v. Orduno CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>WALTER ORDUNO,<br><br>　　Defendant and Appellant. | F068962<br><br>(Super. Ct. No. BF149821A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Walter Orduno led numerous police officers on a high-speed chase through streets and highways in Bakersfield.  Eventually he abandoned his car and fled on foot into a residential neighborhood.  He was soon found hiding in the backyard of a house but

violently resisted the three police officers who attempted to handcuff and arrest him. He was charged with 11 felonies and one misdemeanor based on this course of conduct, including driving recklessly while fleeing from a peace officer; driving the wrong way on a public highway; three counts of resisting a peace officer with force or violence; and transportation of methamphetamine (which was found in the car). He argues his sentence for driving the wrong way on a highway should be stayed pursuant to Penal Code[1] section 654 because he had the same objective in committing both this offense and the offense of driving recklessly while fleeing from a peace officer; his convictions for three counts of resisting a peace officer should be consolidated into a single conviction because all were based on the same incident; and his conviction for transporting methamphetamine should be reversed for insufficiency of evidence. We reject Orduno's claim regarding the consolidation of his convictions for resisting a peace officer. However, we agree his sentence for driving the wrong way on a public highway should be stayed pursuant to section 654 and his conviction for transporting methamphetamine should be reversed for insufficiency of evidence. Accordingly, we remand the matter for resentencing with respect to these latter counts and affirm the judgment in all other respects.

## FACTS AND PROCEDURAL HISTORY

The chase began at 2:57 a.m. on July 21, 2013, when Bakersfield Police Officers Robert "Joe" Woods and Jess Beagley saw a white Ford Crown Victoria, driven by Orduno, speeding while traveling eastbound on Stockdale Highway. Officer Woods gave chase and, after hitting a speed of 100 miles per hour, finally caught up with Orduno as he turned right onto South Real Road. After making the turn, Orduno pulled over to the curb. Israel Lopez, who was sitting in the Crown Victoria's front passenger seat, got out of the car. The officers activated the overhead flashing lights and siren on their

---

[1]Subsequent statutory references are to the Penal Code unless noted otherwise.

unmarked patrol car, but Orduno sped away, heading southbound on South Real Road. Upon crossing Elcia Drive, he slowed down. Officer Beagley saw a passenger in the rear seat, Norma Hernandez-Alvarado, remove a baby from a car seat, open the back passenger-side door, and stick out her foot. Orduno started moving the car forward, and Hernandez-Alvarado, who was holding the baby, fell to the ground outside the car. Orduno quickly sped away. Officer Woods again gave chase, while Officer Beagley stayed behind to attend to Lopez and Hernandez-Alvarado.

At this point, Officer Woods activated a "Code 3 response," meaning that all the patrol car's lights and sirens were in operation. Other officers in marked police cars, with lights and sirens activated, also joined the chase as Orduno drove eastbound on State Route 58. Orduno drove at speeds of up to 100 miles per hour, running several red lights along the way. He finally exited on Union Avenue, but, at the top of the exit ramp, he turned around and drove the wrong way down the same ramp, toward the patrol cars that were pursuing him. He accelerated directly at a patrol car driven by Officer Jason Felgenhauer, with Officer Robert Pair in the passenger seat. Officer Felgenhauer had to "violently maneuver" his patrol car to avoid a head-on collision, ending up on the shoulder of the road. Orduno then drove directly at a patrol car driven by Officer Martin Heredia, who testified that Orduno changed lanes to do so; Officer Heredia also had to pull to the side to avoid being hit. Orduno continued driving in a westbound direction on eastbound State Route 58, with multiple patrol cars in pursuit. A short time later, the Crown Victoria veered toward State Route 58's center median and stopped against the curb. By the time the officers reached the car, Orduno had run away. Officer Woods searched the car and found a small plastic baggie containing crystal methamphetamine. The parties later stipulated that the methamphetamine constituted a usable amount.

Other Bakersfield police officers were dispatched to the area to set up a perimeter, including Officers Travis Brewer, Steven Glenn, and Thomas Hernandez, who brought his police dog, Kane. An onlooker told the officers he saw Orduno run toward Haybert

Court.  Kane alerted to a human scent at 215 Haybert Court.  Officer Hernandez commanded Kane to search the backyard and momentarily Orduno called out, "[Y]our dog has me."  Kane had found Orduno hiding under a table and had bitten his right shoulder and grabbed his shirt.  At Officer Hernandez's direction, Orduno crawled out and lay on his stomach.  However, once Officer Hernandez took Kane away, Orduno tried to get back under the table.  Officers Brewer and Glenn attempted to stop him but he struggled violently and the officers were unable to control him.  Orduno was able to reach into his pocket, where Officer Glenn had felt a knife.  Officer Christopher Moore came into the backyard to assist the officers.  He saw Orduno "violently resisting" the officers who were trying to handcuff him.  However, as he tried to help push Orduno down to the ground, Orduno bucked forcefully, causing Officer Moore to be flung off his back.  Officer Nathan Anderberg came to help and deployed his Taser.  Orduno was then taken into custody.  A folding buck knife was discovered in his pants pocket during a subsequent search.

The Kern County District Attorney filed an information charging Orduno with willful harm or injury to a child (§ 273a, subd. (a)); assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)); fleeing a peace officer's vehicle with willful disregard of persons or property (Veh. Code, § 2800.2); driving the wrong way on a highway while unlawfully fleeing a peace officer (Veh. Code, § 2800.4); three counts of assault on a peace officer with a deadly weapon (§ 245, subd. (c)); three counts of resisting an executive officer by the use of force or violence (§ 69); transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)); and obstructing a peace officer, a misdemeanor (§ 148, subd. (a)(1)).  The information also alleged, with respect to all felony counts, that Orduno had served five prior prison terms within the meaning of section 667.5, subdivision (b).

The case proceeded to trial, and the jury found Orduno guilty on all counts, except that, on the two counts concerning Norma Hernandez-Alvarado and her baby (i.e., willful

harm or injury to a child and assault by means of force likely to cause great bodily injury), Orduno was convicted only of lesser-included misdemeanor offenses. In a bifurcated trial, Orduno admitted one prior-prison-term allegation as to each felony count; the remaining prior-prison-term allegations were dismissed. He was sentenced to a total of 13 years in prison.

## *DISCUSSION*

### I.    *Orduno was properly convicted on three separate counts under section 69*

Orduno was charged with and convicted of three counts of resisting an executive officer by means of force or violence in violation of section 69. Specifically, he was charged in count 8 with resisting Officer Travis Brewer, in count 9 with resisting Officer Christopher Moore, and in count 10 with resisting Officer Steven Glenn. He was convicted of all three counts and sentenced to a consecutive eight-month prison term for each count.

Orduno now contends his three section 69 convictions should be consolidated into a single conviction because resisting multiple executive officers during a single incident constitutes a single violation of the statute. The People respond that Orduno was properly convicted of three separate violations of section 69, notwithstanding the fact that the violations arose from a single incident, because Orduno used force and violence against three different officers. We agree Orduno was properly convicted of three counts of violating section 69.

#### A.    *Factual background*

The section 69 charges and convictions were based on the violent struggle between Orduno and Officers Brewer, Moore, and Glenn, as the officers attempted to arrest Orduno upon finding him in a residential backyard. A police dog, Kane, had detected Orduno hiding under a table in the backyard. After Kane was taken away, Orduno attempted to get back to his hiding spot under the table. The officers tried to stop him, aiming to get him face down on the ground and to handcuff his arms behind his

5.

back. Officer Brewer testified that he grabbed Orduno's right arm and attempted to place it in a "control hold," but was unable to do so as Orduno was "violently struggling" and trying to stand up and pull away. Officer Brewer tried lowering his knee onto Orduno's shoulder blade to force his upper body to the ground, to no avail.

Officer Steven Glenn also testified about the officers' struggle with Orduno. He said he took hold of Orduno's left arm but had difficulty maintaining his grasp because Orduno was resisting violently. When Officer Glenn put his knee down on Orduno's back, Orduno knocked him off and attempted to turn over, at which point Officer Glenn lost control of Orduno's left arm. Orduno shoved his hand into his left-front pants pocket, where Officer Glen could feel Orduno grasping a knife.

Officer Christopher Moore came to assist Officers Brewer and Glenn in the backyard. It was a "really tight, a tight, confined space" that was covered with junk. "It was dark back there," but Officer Moore saw "a suspect on the ground violently resisting" Officers Brewer and Glenn. He described what happened next:

> "As my two partners were at his upper body trying to press his back into the ground—or his chest into the ground, I went up and tried to—I got on his back to press him down on the ground and we weren't getting the desired effect. He wasn't going to the ground. He was still trying to buck up and get out from under us. [¶] And so I delivered a distraction elbow strike to his back, and it didn't have an effect on him. So I delivered another one, and at that point he—he threw himself up so hard that I ended up flying off of him and out of the little confined space area. And as I said, there's a bunch of junk in that yard. I couldn't get back into the—into the fight, so to say, to help get my—or help my officers get him into custody."

It was only when Officer Anderberg arrived and used his Taser that Orduno was handcuffed and taken into custody.

### B. Analysis

The issue is whether Orduno's attacks on Officers Brewer, Glenn, and Moore constitute a single violation or separate violations of section 69. We review de novo purely legal questions such as the interpretation and application of a statute. (*Ghirardo v.*

6.

*Antonioli* (1994) 8 Cal.4th 791, 799; *Dowling v. Farmers Ins. Exchange* (2012) 208 Cal.App.4th 685, 694.) We agree with the People that Orduno was properly convicted of three separate violations of section 69.

Section 69 provides:

"Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment."

The California Supreme Court has explained that section 69 "sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is by resisting by force or violence an officer in the performance of his or her duty." (*In re Manuel G.* (1997) 16 Cal.4th 805, 814; *People v. Smith* (2013) 57 Cal.4th 232, 240-241.) Orduno's convictions are for resisting an officer by means of force or violence in the performance of his duty.

*People v. Hairston* (2009) 174 Cal.App.4th 231, which Orduno cites, defeats Orduno's argument. In *Hairston*, the defendant was convicted of three counts of violating section 148, subdivision (a)(1), which makes it a misdemeanor to resist, delay, or obstruct a peace officer. The defendant ran away from three officers who had accosted him at different times and locations during the same search. He challenged his convictions on the basis that his actions constituted one violation of the statute. The court noted that, "[u]nless the Legislature says otherwise, if a defendant commits a single criminal act that affects multiple victims, he can be convicted of multiple counts of violating the same statute only if the gravamen of the offense 'is centrally an "act of violence against the person."'" (*Hairston*, *supra*, at p. 238.) Contrary to Orduno's assertion, the gravamen of his section 69 offenses is force and violence against the

7.

persons of the individual officers. (See *Brooks v. Superior Court of Los Angeles County* (1966) 239 Cal.App.2d 538, 541 [gravamen of section 69 offense is "threats, force and violence"]; CALCRIM No. 2652.) Under *Hairston*, multiple convictions for multiple victims would be proper even if Orduno had committed only one act.

Further, Orduno committed multiple acts. In *Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, our Supreme Court stated that "a charge of multiple counts of violating a statute is appropriate only where the actus reus prohibited by the statute—the gravamen of the offense—has been committed more than once." (*Id.* at p. 349.) Thus, for example, where a person kills several people while driving intoxicated, he may properly be convicted for multiple violations of the vehicular manslaughter statute but not for multiple violations of the statute prohibiting drunk driving. (*Id.* at pp. 349-350 ["the number of times the act is committed determines the number of times the statute is violated"].) The actus reus or gravamen of the section 69 offenses at issue here is the use of force or violence to resist an officer. The applicable facts show that Orduno committed the act prohibited by section 69 numerous times in the course of the backyard incident. For example, Orduno struggled mightily against Officer Brewer and prevented him from placing his right arm in a control hold. He was also able to pull his left arm violently out of Officer Glenn's grasp. In addition, he hurled both Officers Glenn and Moore off his back as they attempted to force him, face down, to the ground. Since he committed the act prohibited by section 69 multiple times, he may properly be convicted of multiple violations of the statute.

Orduno does not cite any applicable authority for his assertion that section 69 precludes multiple convictions in this instance. Rather, he asserts that his convictions must be consolidated because section 69 does not *expressly* permit multiple convictions based on a single, underlying incident. He contrasts section 69 with section 148, which makes it a misdemeanor to resist, delay, or obstruct a peace officer, with particular reference to section 148's proviso that "[a] person may be convicted of multiple

8.

violations of this section if more than one public officer, peace officer, or emergency medical technician are victims." (§ 148, subds. (a)(1), (e).) Orduno's reliance on section 148 is misplaced because the language of section 69 is not ambiguous, and it is not necessary to compare its terms to those of other statutes for purposes of determining its application and scope. (*People v. Arias* (2008) 45 Cal.4th 169, 177.)

We find no error with respect to Orduno's convictions under section 69.

## II. *The trial court erred under section 654*

Orduno contends the trial court erred under section 654 when it sentenced him to consecutive terms for driving recklessly while fleeing pursuing peace officers (Veh. Code, § 2800.2) and driving the wrong way on a highway in the course of fleeing pursuing peace officers (Veh. Code, § 2800.4). The People respond that the trial court properly sentenced Orduno to consecutive terms for these offenses because he had distinct objectives in committing each offense. We agree with Orduno that, under section 654, his sentence for driving the wrong way must be stayed.

We review the trial court's application of section 654 under the deferential "substantial evidence" standard. (*People v. Green* (1996) 50 Cal.App.4th 1076, 1085.) Section 654, subdivision (a), provides, in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute has been interpreted to bar multiple punishments not only for a single criminal act, but also for a single *indivisible* course of conduct in which the defendant had only one criminal intent or objective. (*People v. Bauer* (1969) 1 Cal.3d 368, 376; *In re Ward* (1966) 64 Cal.2d 672, 675-676; *Neal v. State of California* (1960) 55 Cal.2d 11, 19.) When reasonable minds can differ as to whether a course of conduct comprises a divisible transaction, we apply the "intent

9.

and objective" test set forth in *Neal*: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal, supra,* at p. 19.)

Here, Orduno engaged in an ongoing course of conduct in fleeing numerous pursuing police officers and turning around and driving the wrong way back down the highway exit ramp. However, the evidence supports a finding that this course of conduct was divisible because Orduno had different objectives in committing each offense (i.e., the violations of Veh. Code, §§ 2800.2 & 2800.4). In driving recklessly while fleeing peace officers (Veh. Code, § 2800.2), his objective clearly was to avoid capture and arrest; but, in driving the wrong way down the exit ramp (Veh. Code, § 2800.4), his goal shifted to assaulting the pursuing police officers. Officers Felgenhauer, Pair, and Heredia all testified that Orduno directly targeted their patrol cars, which were in "Code 3" status. Officer Felgenhauer testified that Orduno "made a beeline directly for our patrol vehicle." Officer Heredia testified that Orduno deliberately switched lanes in order to charge head-on at his patrol car. Indeed, Orduno was convicted of three counts of assault with a deadly weapon for targeting these officers.

Although Orduno had different objectives and thus committed separate acts in driving recklessly while fleeing from the police officers and in driving the wrong way down the exit ramp, his sentence for the latter offense nonetheless must be stayed in light of his convictions for assault with a deadly weapon. Orduno's assault crimes and his offense of driving the wrong way are based on the same act, i.e., driving the wrong way down the exit ramp toward the oncoming patrol cars. Consequently, pursuant to section 654, he cannot be punished for the assault crimes *as well as* the driving offense. Orduno was sentenced to

10.

consecutive terms for the assault crimes, i.e., five years for the assault on Officer Felgenhauer and 16 months for the assaults on Officers Pair and Heredia, respectively.[2] Since these terms are longer than his eight-month sentence for driving the wrong way, the latter sentence must be stayed.

### III.    *There is insufficient evidence to support Orduno's conviction for transporting methamphetamine*

Orduno was found guilty of transportation of methamphetamine in violation of Health and Safety Code section 11379, based on the fact that a usable amount of methamphetamine was found in the Crown Victoria he was driving.[3] However, about two weeks prior to his trial, on January 1, 2014, Health and Safety Code section 11379 was amended to make clear that the section applied only to the transportation of drugs with the intent to sell, thereby eliminating criminal liability for the transportation of drugs for personal use. (Health & Saf. Code, § 11379, subd. (c); Stats. 2013, ch. 504, §§ 1-2.) Orduno argues that his conviction for transportation of methamphetamine should be reversed because the prosecution neither presented evidence nor argued that he transported the methamphetamine with the intent to sell it. The People concede the point. We agree with the parties and reverse Orduno's conviction for the transportation of methamphetamine (count 11).

---

[2]Orduno does not challenge the consecutive sentences imposed for his three convictions for assault with a deadly weapon.

[3]Orduno was sentenced to a consecutive term of one year for this offense.

## *DISPOSITION*

The conviction on count 11 is reversed and the case is remanded for resentencing consistent with this opinion.  The trial court is directed to stay the sentence on count 4.  The judgment is otherwise affirmed.

_____

Smith, J.

WE CONCUR:

_____

Gomes, Acting P.J.

_____

Detjen, J.